UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 5:21-cr-00070-JA-PRL

IGNACIO FELIX-SALINAS

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS

The United States of America opposes the motion of defendant Ignacio Felix-Salinas to dismiss the indictment based on constitutional grounds relating to 8 U.S.C. § 1326 (Doc. 14).

## MEMORANDUM OF LAW

The Court should deny Felix-Salinas's motion to dismiss for three reasons:

First, immigration laws are subject to rational-basis review, a highly deferential standard of review that Felix-Salinas cannot overcome. Section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws.

Second, Felix-Salinas's constitutional challenge would fail on a higher level of scrutiny because it focuses almost entirely on the legislative motives of the 1929 Congress, rather than the Congress or successive Congresses that passed § 1326.

Third, Felix-Salinas has failed to show a cognizable disparate impact.

## I.     Statutory background.

Federal law has exercised some restriction on alien migration for over 145 years. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). Since then, successive Congresses and Presidents have passed and enacted various immigration bills into law. In 1882, Congress passed the first general immigration statute. *Id.* Several other statutes quickly followed, *see id.*, and in 1917, Congress passed legislation requiring deportation of certain aliens who had entered the United States "at any time or place other than as designated by immigration officials,...or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.

To enhance the deterrent value of our immigration laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018; *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019) ("In 1929, Congress decided that aliens who 'enter the United States surreptitiously' should be subject to not only deportation but also criminal penalties, and revised the prohibitions in the 1917 statute[.]") (internal citation omitted).

Over 20 years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction); *see also City & Cty. of San Francisco v. United States Citizenship &*

*Immigr. Servs.*, 944 F.3d 773, 795 (9th Cir. 2019) ("Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952."). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 *et seq.*), Congress passed the bill that would later be codified as 8 U.S.C. § 1326.

Over the years, Congress has updated § 1326 multiple times—and always to enhance its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181; *see also United States v. Maul-Valverde*, 10 F.3d 544, 545 (8th Cir. 1993). Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009.

## II.   There is a Rational Basis for § 1326

### A.   Section 1326 is Subject to Rational Basis Review

Congress's legislative power in the arena of immigration law is plenary. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *see also Mathews v. Diaz*, 426 U.S. 67,

3

82 (1976). This judicial deference applies equally to constitutional questions. *See Othi v. Holder*, 734 F.3d 259, 269 (4th Cir. 2013). The Supreme Court and the Eleventh Circuit have reaffirmed these longstanding principles. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("[O]ur opinions have reaffirmed and applied [this] deferential standard of review across different contexts and constitutional claims."); *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984) (stating that executive and congressional actions on immigration are viewed through a narrow and deferential standard of review), *aff'd*, 472 U.S. 846 (1985).

This deference is limited to considering whether the challenged law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, journalists challenged the Attorney General's denial of admission to a Belgian journalist who had been invited to speak at a conference at Stanford University. *Id.* at 756-57. Although the Supreme Court acknowledged that the challengers' constitutional "right to receive information" was implicated, it nonetheless limited its review to whether the Executive had given a "facially legitimate and bona fide" reason for its action. *Id.* at 764-65, 769. Thus, "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770. The Supreme Court continues to apply *Mandel*'s instruction. *See Kerry v. Din*, 576 U.S. 86, 105 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien)

(Kennedy, J., concurring); *see also Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) ("*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

*Mandel*'s deferential test applies equally to congressional decision-making. In *Fiallo*, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children, a "categorical" entry classification that discriminated on the basis of sex and legitimacy. *See* 430 U.S. at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Trump*, 138 S. Ct. at 2419.

In the Eleventh Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test requires courts to apply rational-basis review when considering matters of immigration and naturalization. When a federal statute discriminates among *categories* of aliens (such as those who have entered the country lawfully versus those who have entered unlawfully), instead of against aliens *generally*, the statute is subject to rational-basis review, as opposed to heightened or strict scrutiny. *See Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1347-48 (11th Cir. 1999); *see also United States v. Osorto*, 995 F.3d 801, 811 (11th Cir. 2021) ("federal laws that discriminate against noncitizens must pass only rational-basis scrutiny under the Fifth

Amendment") (citation omitted).

Felix-Salinas's argument that rational-basis review does not apply here is aspirational rather than precedential. He claims that the protected class at issue involves race, not alienage. Section 1326, however, expressly targets a subset of *aliens* and it says nothing about the race of those aliens. Although Felix-Salinas discusses the impact of the statute on Mexicans and Latinos, the statute applies to any individual, of any nationality or ethnicity, who unlawfully reenters the country after removal whether they are from Afghanistan, Zimbabwe, or any country alphabetically in-between.

###   B.   Section 1326 Satisfies Rational-Basis Review.

A statute is constitutional under rational basis scrutiny so long as "there is any reasonably conceivable state of facts that could provide a rational basis" for the statute. *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The "burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it[.]" *Id*. (emphasis added)

The government has a legitimate interest in deterring aliens from illegally reentering the United States. The relationship between that interest and § 1326— which provides sanctions for repeated violations of United States immigration law— is clear. It is also plainly rational. *See, e.g.*, *Abebe v. Mukasey*, 554 F.3d 1203, 1207 n.6 (9th Cir. 2009) ("[F]ederal power is at its zenith" in immigration setting); *United*

*States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) (absent criminal prosecution, immigration enforcement would be "all bark and no bite"); *United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) (strong societal interest in punishing illegal reentry into the United States); *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991).

Because § 1326's purpose is plainly legitimate and inextricably linked to the government's undeniable interest in enforcing its immigration laws, the statute easily passes that "minimal [form of] scrutiny." *Morales-Santana*, 137 S. Ct. at 1693. *See Resendiz-Alcaraz*, 383 F.3d at 1271-72. In this case Felix-Salinas has failed to provide any reason to negate this rational basis, and has certainly not negated every conceivable basis to support the statute. As such, his challenge to § 1326 fails under rational-basis review.

The inability to successfully challenge § 1326 under rational-basis review is not novel. "[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump*, 138 S. Ct. at 2420. "On the few occasions where we have done so," the Court continued, "a common thread has been that the laws at issue lack any purpose other than a bare…desire to harm a politically unpopular group." *Id.* (internal quotation marks and citation omitted). That is not the case with § 1326—a law seeking to deter *all* aliens from unlawfully reentering the country following removal. To the extent that this Court needed further proof of the statute's rational relationship to its goal of deterrence and enforcement, Felix-Salinas's prior removals and subsequent reentries, as well as his

racketeering and weapons convictions, is evidence enough. *See United States v. Crews*, 495 F. App'x 36, 38 (11th Cir. 2012) ("The government has a legitimate interest in 'prevent[ing] repeat offenders from continuing to victimize society.'") (quoting *United States v. Johns*, 984 F.2d 1162, 1164 (11th Cir. 1993)).

For the reasons explained above, § 1326 satisfies rational-basis review. Felix-Salinas's equal-protection claim, therefore, fails.

## III.   Felix-Salinas has failed to satisfy the requirements of *Arlington Heights*.

Felix-Salinas further insists that § 1326 violates equal protection based on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). That case is inapplicable for two reasons. First, Felix-Salinas fails to cite any case in the Supreme Court or the Eleventh Circuit applying the rubric of *Arlington Heights* to immigration laws passed by Congress. *Arlington Heights* invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. However, such an inquiry cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking. *Accord Trump*, 138 S. Ct. at 2420 n.5 (criticizing "the dissent's assumption that courts should review immigration policies...under the de novo 'reasonable observer' inquiry").

If the Court could, in fact, probe the motives of the legislators who passed the challenged immigration law, Felix-Salinas's challenge would still fail. This is because

nearly the entirety of Felix-Salinas's equal-protection argument hinges on the motives of a handful of Congressmen involved in the passing of § 1326's predecessor statute in 1929. Putting aside the fact that "it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment[,]" *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), Felix-Salinas's challenge fails because it is levelled at the wrong set of legislative motives.

Official action will not be held unconstitutional solely because it results in a racially disproportionate impact. *Washington v. Davis*, 426 U.S. 229 (1976). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* at 242. Rather, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *Arlington Heights*, 429 U.S. at 265. While a moving party need not prove that the challenged action rested solely on racially discriminatory purposes, determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into circumstantial and direct evidence of intent. *Id.* at 265-66. In *Arlington Heights*, the Court identified a non-exhaustive list of the subjects of proper inquiry in determining whether racially discriminatory intent existed, which Felix-Salinas sets forth in his motion (Doc. 14 at 5). *See id.* at 267-68; *see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1321-22 (11th Cir. 2021).

As addressed above, the governing statutory framework of United States immigration law was enacted in 1952, when Congress replaced prior disparate

statutes with the comprehensive INA. Moreover, in addition to enacting § 1326 in 1952, Congress has updated or modified the statute multiple times since, including in 1988, 1990, 1994, 1996, and 1997. Each time Congress did so, it strengthened the law. Felix-Salinas has presented no argument or evidence with regard to these subsequent enactments. Such omissions are fatal to his claim, which, as explained in greater detail below, falters for factual reasons.

In Felix-Salinas's recounting, the history of § 1326 essentially ended in 1929. But § 1326 did not even exist then, and Congress has repeatedly revisited the statute since its enactment later, in 1952. Felix-Salinas's near-exclusive focus on legislators' comments from the 1920s sheds little light on a statute that was conceived in 1952 and has been amended many times since. According to Felix-Salinas, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. Legislative intent, however, is not an artifact that "carr[ies] over" from one law to the next. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Palmer*, 403 U.S. at 225 (describing the paradox of passing a law based on the bad motives of its supporters that could then be presumptively valid if repassed for different reasons). As the Supreme Court has put it in a different context:

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates

10

one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*United States v. O'Brien*, 391 U.S. 367, 384 (1968) (emphasis added).

Viewed accordingly, even assuming that *Arlington Heights* applies here, Felix-Salinas still would not succeed. First, "[t]he ultimate question" under *Arlington Heights* must be "whether a discriminatory intent has been proved in [the] given case"—that is, for the particular challenged enactment. *City of Mobile*, 446 U.S. at 74. Here, the cited discriminatory intent is neither recent—preceding § 1326 by more than two decades—nor proven in the "given case" (i.e., the 1952 statute or any of its subsequent versions). While it is true that, under *Arlington Heights* "legislative or administrative history may be highly relevant," the Supreme Court has specified that this is especially so "where there are *contemporary* statements by members of the decision making body[.]" *Arlington Heights*, 429 U.S. at 268 (emphasis added); *see also id.* at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision"). The Court's most recent application of *Arlington Heights* bears this out, where statements made remotely in time and in unrelated contexts were not probative of the decision at issue. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion) (quoting *Arlington Heights*, 429 U.S. at 268).

11

Second, if this Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a substantial or motivating factor behind the 1929 immigration law's enactment, the burden would then shift to the law's defenders to demonstrate that the law would have been enacted without this factor. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (citations omitted). That burden is easily met here, where the law has a clear rational basis and where Felix-Salinas barely attempts to challenge the 1952 law or its amendments. Indeed, we need not speculate that the law *would have been* enacted; it was in 1952, and then it was revised several times over. So, even if we accept the worst about the original Congress that enacted the 1929 legislation, § 1326 would still not violate principles of equal protection. Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of Felix-Salinas's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult, problem of illegal immigration.

To the extent that Felix-Salinas tries to directly attack the legislature that enacted the 1952 statute, his evidence of discriminatory intent is sparse. Felix-Salinas devotes a single paragraph of his motion to the enactment of the 1952 INA, because there is insufficient evidence to demonstrate that racial animus underpinned its passage. Doc. 14 at 15-16. Felix-Salinas mentions that unspecified congressmen may have "casually used the racial epithet 'wetback' when the INA was being considered." *Id.* at 15. He also points to a single letter, not from a member of

12

Congress, but from the then-Deputy Attorney General, that included the term "wetback." *Id.* But the greater picture shows that Congress actually sought to remove racial bars to immigration with the INA. Although there may have been "problematic rhetoric" by seven senators who proposed the so-called "wetback amendment" during debate preceding the override of President Truman's veto, *see United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567, at *7 (D.V.I. June 16, 2021) (citing 82 Cong. Rec. 8122 (June 26, 1952)), that amendment was voted down by a count of 11 to 65. 82 Cong. Rec. 8123 (June 26, 1952). Meanwhile, as the Act went to a vote on whether to override President Truman's veto, Congressman Francis Walter proclaimed on the floor:

> The message before us points to many good and desirable provisions of the bill. Among them it lists the removal of racial barriers to immigration and naturalization; the removal of discriminations between sexes, and other improvements of the existing law. If the President's veto is sustained, none of these improvements will be written into law.

82 Cong. Rec. 8215 (June 26, 1952). Congressman Walter Judd later echoed this sentiment, stating:

> I submit that it is the President's veto that repudiates our basic religious concepts, our belief in the brotherhood of man, because it keeps our statutes as they are, with hundreds of millions of people in those crucial areas still outlawed because of the color or the pigment of their skin....We must make clear to watching millions that the representatives of the people of the United States believe in trying to correct things that are inequitable; that we want to improve relations between our country and all the peoples in the world who want to be free[.]

82 Cong. Rec. 8218 (June 26, 1952). Felix-Salinas suggests that President Truman's veto was motivated by concerns about the Act's racial animus, but these comments

show otherwise. Indeed, Congress was striving to remove racial barriers to immigration by passing the Act. Moreover, when Congress overrode President Truman's veto, every senator who had argued for the "wetback amendment" voted against the veto override, thereby "rendering whatever discriminatory purpose those eleven may have held inapplicable to the Act's passage." *Wence*, 2021 WL 2463567, at *8 (citing 82 Cong. Rec. 8267 (June 27, 1952)). Put simply, Felix-Salinas's attempt to paint the 1952 statute with the same brush as the 1929 enactment fails. He cannot show that the same racial animus that may have motivated Congress in 1929 also led it to pass the INA in 1952.

Post-*Arlington Heights* cases do not show agreement with Felix-Salinas's that § 1326 is forever tainted. Such cases recognize, for example, that, while the historical background of a decision is one source of evidence of intentional discrimination under *Arlington Heights*, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). "Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." *Id.* "[T]he presumption of legislative good faith [is] not changed by a finding of past discrimination." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *City of Mobile*, 446 U.S. at 74). Indeed, when assessing an equal-protection challenge, the relevant focus must be on the legislature that *actually* enacted the challenged law or policy, not on earlier legislatures:

14

*Id*. at 2325.

Taken collectively, the case law is strongly in favor of rejecting Felix-Salinas's attempt to shoehorn legislative history from the 1920s into the 1952 INA or the present-day version of § 1326. Felix-Salinas's evidence from the 1920s "has little probative value" for understanding Congress's motivation for enacting §1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997. *See McCleskey*, 481 U.S. at 298 n.20. The 1929 statute is simply not before the Court, and the acts of a prior legislature are not imputed on the subsequent legislatures that pass the challenged statute and its amendments.

Courts of appeals have rejected the "forever tainted" argument that Felix-Salinas urges. For example, in *United States v. Johnson*, the D.C. Circuit rejected an argument that is conceptually identical to Felix-Salinas's. 40 F.3d 436 (D.C. Cir. 1994). There, the defendants challenged 21 U.S.C. § 841(b) (enacted as part of the Anti–Drug Abuse Act of 1986) on the grounds that its "sentencing scheme violates the equal-protection component of the Fifth Amendment by disproportionately and invidiously impacting blacks through meting out of harsher penalties for offenses involving crack cocaine[.]" *Id*. at 439. The defendants pointed to racist legislative statements made during debates preceding a 1914 statute that criminalized cocaine trafficking. *Id*. at 440. The D.C. Circuit rejected this line of attack, noting the following:

> Appellants urge us to ascribe a discriminatory intent to Congress based
> on rather sketchy and unpersuasive bits of information. They point first
> to the undeniable racism that animated legislative debate leading to the

> passage of a 1914 statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated. We think this information is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act.

*Id*. (citing *McCleskey*, 481 U.S. at 298 n.20). Concluding, the *Johnson* court observed that "it would be anomalous to attempt to tar the present Congress with the racist brush of a pre-World War I debate." *Id*. Echoing *Johnson*, the Ninth Circuit also rejected a like challenge to § 841(b):

> In support of his discriminatory purpose argument, Dumas points to the racism which permeated the legislative debates leading to enactment of the Harrison Act of 1914, the first federal law to criminalize cocaine.
>
> The crack/powder cocaine sentencing distinction was adopted in 1986, with the passage of the Anti-Drug Abuse Act. The changes which occurred in American society between 1914 and 1986-changes brought about in part by successive Congresses and by the impact of the Voting Rights Act on the makeup of Congress itself-make it "anomalous" to ascribe to the 1986 Congress the racism of the Congress of 1914.

*United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995) (citing *Johnson*, 40 F.3d at 440).

In any challenge to a statute, the critical focus must be on the contested law itself, not its two-decade-old predecessor. Divining the intent of a particular legislature is a difficult enough enterprise. The Supreme Court has described it as "a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and "a hazardous matter," *O'Brien*, 391 U.S. at 383. Attempting to ascertain the intent of a Congress from 1929 and then imputing it—with virtually no supporting evidence—to a Congress from 1952 (or from 1988, 1990, 1994, 1996, or 1997), is not only "problematic" or "hazardous"—it is illogical. This Court, therefore, should decline

16

Felix-Salinas's invitation to participate in this undertaking.

To the government's knowledge, to date, only five district courts have addressed the precise challenge presented in Felix-Salinas's motion. Four of those courts have rejected it. *See United States v. Machic-Xiap*, — F. Supp. 3d —, No. 3:19-CR-407-SI, 2021 WL 3362738, at *15 (D. Or. Aug. 3, 2021) (sins of the 1929 law does not require proof that Congress expressly disavowed all prior improper motives in passing subsequent legislation); *Wence*, 2021 WL 2463567, at *9 (absence of proof of discriminatory intent in 1952 law); *United States v. Palacios Arias*, No. 3:20-cr-62-JAG, ECF No. 37 at 6 n.7 (E.D. Va. Oct. 13, 2020) (1929 law is too attenuated from the 1952 law) *United States v. Morales-Roblero*, 2020 WL 5517594, at *9 (S.D. Cal. Sept. 14, 2020) (analysis of *Arlington Heights* was "fatally flawed"). One court has accepted Felix-Salinas's argument. *See United States v. Carrillo-Lopez*, No. 320CR00026MMDWGC, 2021 WL 3667330, at *25 (D. Nev. Aug. 18, 2021). The government has filed a notice of appeal from the decision in *Carrillo-Lopez*.

## IV.   Felix-Salinas cannot demonstrate a cognizable disparate impact.

Felix-Salinas has failed to show sufficient discriminatory animus on the part of the Congress that *actually* passed (or subsequently modified) § 1326. Moreover, Felix-Salinas cannot demonstrate a cognizable disparate impact. Felix-Salinas cites the higher percentage of § 1326 prosecutions of Mexican and Hispanic defendants as proof of disparate impact and discrimination. Doc. 14 at 6-8. But it is not. As a threshold matter, § 1326 applies to any alien who reenters the United States illegally. The statute makes no distinctions based on particular nationality or race, and such

laws are presumptively compliant with equal protection principles. *See Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause.") (internal quotation marks and citation omitted).

In any event, the statistics that Felix-Salinas cites are the product of geography, not discrimination. For instance, in Fiscal Year 2020, Customs and Border Protection logged 405,036 total "encounters." *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (400,651) occurred on the Southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020; *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) ("Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year."). Those numbers are neither surprising nor illuminating of Congress's motives, whether in the 1920s or any other decade. Indeed, if it were enough to state an equal-protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity or nationality—including those from a country sharing 1,954 miles of border with the United States—countless laws could be challenged on that ground. In fact, the Supreme Court recently rejected just this sort of equal-protection claim, holding that the disparate impact caused by the rescission of Deferred Action for Childhood Arrivals ("DACA") on Hispanics from Mexico—totaling 78 percent of DACA recipients—did not establish a plausible equal-protection claim "because Latinos

make up a large share of the unauthorized alien population, [and] one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *See Regents*, 140 S. Ct. at 1915. Continuing, the Court noted that, "[w]ere this [statistical] fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916. It is therefore not surprising that these statistics-based arguments have been rejected in other contexts. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003) (selective prosecution claim for § 1326); *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (prosecution of cocaine base trafficking cases resulting in substantially more African American defendants); *United States v. McClendon*, 379 F. App'x 898, 901 (11th Cir. 2010) ("The disparate impact of the guidelines on African American defendants is insufficient to show that Congress had a discriminatory intent."). And of course, these holdings are in accord with longstanding Supreme Court precedent, including *Arlington Heights*, which itself states that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264-65; *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."); *Davis*, 426 U.S. at 242 ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.").

Felix-Salinas has not demonstrated a cognizably disparate impact.

## V.     No hearing is necessary

The United States submits that no hearing is necessary for the Court to decide Felix-Salinas's motion. As discussed above, the United States largely does not contest the historical record cited with regard to the 1929 statute or the 1952 INA. Rather, the United States contends that, even accepting such a record, Felix-Salinas cannot establish that the motives of the 1929 Congress forever tainted the enactment of section 1326. Thus, there is no need for testimony to supplement that record.

## VI.    Conclusion

For the foregoing reasons, the Court should deny Felix-Salinas's motion to dismiss the indictment.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:     */s/ Daniel M. Baeza*
Daniel M. Baeza
Assistant United States Attorney
United States Attorney No. 164
400 North Tampa Street, Ste. 3200
Tampa, Florida 33602
Telephone:   (813) 274-6000
E-mail:   daniel.baeza@usdoj.gov

**U.S. v. Ignacio Felix-Salinas**          **Case No. 5:21-cr-00070-JA-PRL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2021, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Defense Counsel of Record

*/s/ Daniel M. Baeza*
Daniel M. Baeza
Assistant United States Attorney
United States Attorney No. 164
400 North Tampa Street, Ste. 3200
Tampa, Florida 33602
Telephone:   (813) 274-6000
E-mail:   daniel.baeza@usdoj.gov